876 P.2d 1190

**DEUTSCHE CREDIT CORPORATION, a Delaware corporation, Plaintiff–Appellee,**

v.

**CASE POWER & EQUIPMENT COMPANY, an Arizona corporation, Defendant–Appellant.**

No. 1 CA–CV 91–0653.

Court of Appeals of Arizona, Division 1, Department A.

June 28, 1994.

Wortman and Campbell by Harold E. Campbell, III, Phoenix, for appellant.

Norling, Perry, Pierson & Kolsrud, P.L.C. by Nancy L. Rowen and Mark D. Svejda, Phoenix, for appellee.

## OPINION

VOSS, Judge.

Case Power and Equipment Company (Case) appeals from summary judgment awarding $8,964.90 to appellee Deutsche Credit Corporation (Deutsche) in its action for conversion of an excavator in which Deutsche had a perfected security interest. The appeal presents the question whether Case took the excavator free of Deutsche's security interest pursuant to Uniform Commercial Code (UCC) section 9–307,[1] when it bought the excavator in the ordinary course of business from a dealer in such equipment to whom Deutsche's debtor had transferred title. Also before the court is whether Deutsche should be awarded attorneys' fees on appeal pursuant to Ariz.Rev.Stat.Ann. (A.R.S.) section 12–341.01(A) or Rule 25, Arizona Rules of Civil Appellate Procedure (Rule).

## FACTS AND PROCEDURAL HISTORY

RSS, Inc. (RSS), not a party below, has been in existence since at least June 11, 1977. As of August 9, 1990, Richard S. Steensland and Marsha Steensland were RSS's only directors and officers. RSS's address was 3570 N.W. Grand Ave. in Phoenix.

All Quip of Arizona, Inc. (All Quip), not a party to the appeal, has been in existence since at least January 7, 1986. As of September 10, 1990, Richard S. Steensland and Marsha Steensland were its only directors and officers. Like RSS, All Quip's address was 3570 N.W. Grand Ave. in Phoenix.

The record contains a letter from RSS to the Annual Reports Section of the Arizona Corporation Commission dated August 9, 1990. The letterhead of the stationery on which the letter was written named "RSS INC," and also contained a logo consisting of the stylized designation "ALL QUIP" represented as the chassis and wheels of a piece of earth-moving equipment.

On December 4, 1986, RSS bought a Tiger brand excavator from Takeuchi Manufacturing under a "Retail Installment Contract/Security Agreement" (security agreement) by which RSS granted Takeuchi a security interest in the excavator as collateral. Takeuchi assigned its interest in the security agreement to Deutsche and perfected the security interest by filing a financing statement. The financing statement identified Deutsche as Takeuchi's assignee.

Without Deutsche's knowledge, and in breach of the security agreement, RSS conveyed its ownership interest in the excavator to All Quip at some point on or before October 12, 1988. All Quip did not grant a security interest to Deutsche in connection with this transfer.

Case had bought numerous items of heavy equipment from All Quip before the events that generated this litigation. On October 12, 1988, Case bought the Tiger excavator from All Quip out of inventory on All Quip's lot. Case paid for it with a check for $35,000.00. Case received a paid invoice that contained All Quip's logo and full corporate name, but which made no reference to RSS. All Quip did not inform Case that Deutsche had a security interest in the excavator or that All Quip had obtained it from RSS. Deutsche did not know about or consent to All Quip's selling the excavator to Case.

RSS defaulted on its obligations under the security agreement. Deutsche brought this action against All Quip and Case for conversion, and against All Quip and the Steens-

---

1. Arizona substantially adopted the 1972 revised version of the UCC in 1975 Ariz.Sess.Laws, ch. 65, by amending and deleting portions of an earlier version of the UCC adopted in 1967 Ariz. Sess.Laws, ch. 3, and enacting additional sections that appeared for the first time in the 1972 UCC. The legislature renumbered Arizona's version of the UCC to conform to the UCC number- ing system. 1984 Ariz.Sess.Laws, ch. 77. In this opinion we refer to the applicable sections of the Arizona UCC according to their designation and numbering in the current version of the UCC: e.g., UCC section 9–307 (equivalent to A.R.S. section 47–9307). See Prairie State Bank v. IRS of Treasury Dept., 155 Ariz. 219, 745 P.2d 966 (App.1987).

lands seeking compensatory and punitive damages for conspiracy to commit a fraudulent conveyance. The Steenslands answered, denying personal involvement or liability and informing the court that All Quip had commenced Chapter 11 bankruptcy proceedings. Deutsche dismissed the action against All Quip without prejudice.

Case answered Deutsche's complaint on December 19, 1990, denying most of Deutsche's allegations for lack of sufficient information. On May 23, 1991, Deutsche moved for summary judgment on its conversion claim against Case. In response, Case argued that due to the close relationship between RSS and All Quip, Case had purchased the excavator free of Deutsche's perfected security interest pursuant to UCC section 9-307,[2] and asked the trial court for a continuance to conduct discovery "[i]n order to submit affidavits to further establish its defense under *Adams....*" (referring to *Adams v. City Nat'l Bank and Trust Co.*, 565 P.2d 26 (Okla.1977)).

The trial court, without commenting on Case's request, granted Deutsche's motion for summary judgment. It entered a Rule 54(b) judgment in accordance with its ruling, denying Deutsche's request for an award of attorneys' fees. Case timely appealed. We have jurisdiction pursuant to A.R.S. section 12-2101(B) (Supp.1993).

## DISCUSSION

### A. Standard of Review

■ Summary judgment should be granted if the facts produced in support of a claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense. *Orme School v. Reeves*, 166 Ariz. 301, 802 P.2d 1000 (1990).

On appeal from summary judgment, we view the facts in the light most favorable to the appellant. *Chaparral Dev. v. RMED International, Inc.*, 170 Ariz. 309, 823 P.2d 1317 (App.1991). For questions of statutory interpretation, however, we are not bound by the trial court's interpretation and conduct our review de novo. *Hampton v. Glendale Union High School Dist.*, 172 Ariz. 431, 433, 837 P.2d 1166, 1168 (App.1992).

### B. Applicability of UCC section 9-307

#### 1. Interpretation of section 9-307

When a debtor sells collateral subject to a security interest the general rule is that:

> *[the] security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise,* and also continues in any identifiable proceeds including collections received by the debtor.

UCC § 9-306(2) (emphasis added). The only applicable exception to this rule is found in UCC section 9-307(1).[3] To come within its protection, the buyer must establish: (1) he bought the collateral from a person in the business of selling goods of that kind; (2) he bought in good faith and without knowledge that the sale would violate the ownership rights or a security interest of a third party; and (3) the security interest to which the collateral was subject was "created by his seller." *See* UCC sections 1-201(9) and 9-307; UCC Official Comment, Para. 2, 3A UNIFORM LAWS ANNOTATED at 257-58 (West 1992).

■ Here, in response to Deutsche's motion for summary judgment, Case offered evidence sufficient to establish that All Quip was in the business of selling heavy equip-

---

**2.** UCC section 9-307(1) provides:
(1) A buyer in ordinary course of business (subsection (9) of Section 1-201) other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the buyer knows of its existence.
UCC section 1-201(9) provides in part:
(9) "Buyer in ordinary course of business" means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind.... "Buying" may be for cash or by exchange of other property or on secured or unsecured credit....

**3.** Set forth *supra,* note 2.

ment of the kind that Case bought from it; that Case bought the Tiger excavator in good faith and paid substantial value for it; and that Case lacked any knowledge of the existence of Deutsche's security interest, much less that the sale was in violation of it. Accordingly, had Case also tendered sufficient evidence to raise a triable fact issue on whether Deutsche's security interest was "created by [Case's] seller," Case was potentially entitled to prevail under UCC section 9–307(1), and the trial court would have erred in granting summary judgment against it. Case, however, failed to show how the creation of the security interest could arguably be attributed to All Quip.

The leading decision on the "created by his seller" requirement of UCC section 9–307(1) is *National Shawmut Bank v. Jones*, 108 N.H. 386, 236 A.2d 484 (1967). In that case Wever bought a car from Wentworth Motor Co. and granted it a security interest which Wentworth thereafter perfected and assigned to National Shawmut Bank. Wever transferred the car to Hanson–Rock, Inc., an automobile dealer. Defendant Jones later bought the car from Hanson–Rock without knowledge of the bank's security interest. The Supreme Court of New Hampshire held that because the bank's security interest was not created by Hanson–Rock, but rather by Wever, UCC section 9–307(1) did not apply. *Id.* The court also stated that because subsections (1) and (2) of section 9–307 were the only provisions of UCC Article 9 under which a buyer of goods could claim to take free of a security interest where a sale was held without the secured party's consent, and section 9–306(2) provided that a security interest continues in collateral "except when this Article provides otherwise," there was no leeway to create any other exceptions in the absence of a custom, usage, or agreement to the contrary. *Id.*

*National Shawmut Bank* has been widely followed. *See, e.g., Security Pacific Nat'l Bank v. Goodman*, 24 Cal.App.3d 131, 100 Cal.Rptr. 763 (1972) (registered owner of boat in which bank had perfected security interest traded boat for "credit" to dealer who then sold boat to buyers; held, buyers did not qualify under section 9–307(1) be-cause security interest not created by their seller); *Martin Brothers Implement Co. v. Diepholz*, 109 Ill.App.3d 283, 64 Ill.Dec. 768, 440 N.E.2d 320 (1982) (9–307(1) does not protect buyer in ordinary course from security interest created by former owner who was not buyer's seller); *Vacura v. Haar's Equipment, Inc.*, 364 N.W.2d 387 (Minn.1985) ("security interest created by his seller" refers only to security interest given by seller as debtor and does not include any other security interest even though created in agreement to which seller was non-debtor party); *Ocean County National Bank v. Palmer*, 188 N.J.Super. 509, 457 A.2d 1225 (1983); *Executive Financial Services, Inc. v. Pagel*, 238 Kan. 809, 715 P.2d 381 (1986); *First State Bank v. Barnes*, 496 So.2d 53 (Ala.Civ.App. 1986). *See generally* J.P. Ludington & A.L. Schwartz, Annotation, *Construction and Effect of UCC Art. 9*, 30 A.L.R.3d 9 (1970); W.H. Lawrence, *"Created by his Seller" Limitation of Section 9–307(1): Provision in Need of Articulated Policy*, 60 IND.L.J. 73 (1984–85).

*Executive Financial Services, Inc. v. Pagel* held adversely to Case's position on similar facts. In that case, Executive Financial Services (EFS) bought three tractors from Tri–County Farm Equipment and leased them simultaneously to Mohr–Loyd Leasing, a partnership of the two owners of Tri–County. Tri–County later purported to sell the tractors to third parties. Affirming the trial court, the Supreme Court of Kansas held that the leasing contract between EFS and Mohr–Loyd was in reality a security agreement, and that UCC section 9–307(1) did not protect the third party purchasers because it was Mohr–Loyd Leasing, not Tri–County Farm Equipment, their seller, that had created the security interest in favor of EFS. *Cf. Sears Consumer Fin. Corp. v. Thunderbird Prod.*, 166 Ariz. 333, 336, 802 P.2d 1032, 1035 (App.1990) (UCC section 9–307(1) was inapplicable to inventory security interest granted by Dealer 1 where collateral was bought in ordinary course from inventory of Dealer 2, because statute "extinguishes only a security interest created by the seller.").

## 2. The "Seller" within 9–307(1)

Here there is no dispute that RSS created the security interest under which Deutsche claims, while All Quip actually sold the collateral to Case. Accordingly, Case is ineligible for the protection of section 9–307(1) absent a showing that the corporate existence of both RSS and All Quip may legitimately be disregarded and the Steenslands themselves viewed as both the creators of Deutsche's security interest and the sellers of the collateral to Case. This would require successful invocation of the "alter ego" or "piercing the corporate veil" doctrine.

■■■ The concept of a corporation as a separate entity is a legal fact, not a fiction. *Washington National Corp. v. Thomas,* 117 Ariz. 95, 570 P.2d 1268 (App.1977).[4] The mere fact that corporations have the same officers does not make one liable for the acts of the other. *Id.; Jabczenski v. Southern Pacific Memorial Hospital, Inc.,* 119 Ariz. 15, 579 P.2d 53 (App.1978); *Ize Nantan Bagowa, Ltd. v. Scalia,* 118 Ariz. 439, 577 P.2d 725 (App.1978). In *Ize Nantan Bagowa* we stated:

> The courts have conditioned recognition of corporateness on compliance with two requirements: (1) business must be conducted on a corporate and not a personal basis; (2) the enterprise must be established on an adequate financial basis. Henn, Law of Corporations 2nd Ed., § 147 (1970). The corporate fiction will be disregarded when the corporation is the alter ego or business conduit of a person, and when to observe the corporation would work an injustice. The alter ego status is said to exist when there is such a unity of interest and ownership that the separate personalities of the corporation and the owners cease to exist. *Dietel v. Day,* 16 Ariz.App. 206, 492 P.2d 455 (1972). *Employers' Liability Assurance Corporation v. Glens Falls Insurance Company,* 12 Ariz.App. 362, 470 P.2d 682 (1970).

*Id.* at 442, 577 P.2d at 728. *Accord Bischofshausen Vasbinder & Luckie v. D.W. Jaquays Mining & Equipment Contractors,* 145 Ariz. 204, 208, 700 P.2d 902 (App.1985). *See also Gatecliff v. Great Republic Life Ins. Co.,* 170 Ariz. 34, 821 P.2d 725 (1991) (in parent-subsidiary case, plaintiff must prove both (1) unity of control and (2) observance of corporate form would sanction a fraud or promote injustice); *Jabczenski,* 119 Ariz. at 21, 579 P.2d at 59 (Two corporations can be regarded as the same if "[e]ither the dominant corporation ... so control[s] and use[s] the other as a mere tool or instrument in carrying out its own plans and purposes that justice requires it be held liable for the results, or, there [is] such a confusion of identities and acts as to work a fraud upon third persons.").

■■■ Here, the documentation Case provided from the Arizona Corporation Commission might have been sufficient to raise triable issues on whether RSS and All Quip were used to perpetrate a fraud and whether recognizing their corporate existence would work an injustice, but under Arizona case law, neither the trial court nor we may proceed to disregard the separateness of RSS and All Quip without satisfaction of the second part of the test. Additional proof is required to show that the two corporations were "alter egos" of the Steenslands, that is, that there was such a unity of interest and ownership that the separate personalities of the corporations and the owners ceased to exist.

Arizona decisions have identified the following considerations, among others, as material to this issue: common officers or directors; payment of salaries and other expenses of subsidiary by parent (or of corporation by shareholders); failure to maintain formalities of separate corporate existence; similarity of corporate logos; plaintiff's lack of knowledge of separate corporate existence; owners' making of interest-free loans to corporation; maintaining of corporate financial records; commingling of personal and corporate funds; diversion of corporate property for shareholders' personal use; observance of formalities of corporate meetings; intermixing of shareholders' actions with those of

4. Disapproved on another ground by *Greenfield v. Cheek,* 122 Ariz. 57, 593 P.2d 280 (1979), which was in turn overruled on the same point

by *State v. Gunnison,* 127 Ariz. 110, 618 P.2d 604 (1980).

corporation; and filing of corporate income tax returns and ACC annual reports. *See Gatecliff,* 170 Ariz. 34, 821 P.2d 725; *Standage v. Standage,* 147 Ariz. 473, 711 P.2d 612 (App.1985); *Honeywell, Inc. v. Arnold Construction Co.,* 134 Ariz. 153, 654 P.2d 301 (App.1982). Here, Case only presented evidence that RSS and All Quip had common officers and owners.

### 3. Case's Showing in Response to Motion for Summary Judgment

■ Defense discovery in this action might appropriately have examined some or all of the above, and Case had a full nine months within which to conduct appropriate discovery. *Cf. Pendleton v. Cilley,* 118 Ariz. 84, 574 P.2d 1303 (1978) (two months that elapsed between filing and granting of motion for summary judgment provided party with ample time to make any necessary discovery or move for a continuance under civil Rule 56(f)). The problem for Case here is that its counsel conducted none.

We do not accept as justification for counsel's inaction his assertion that "[u]ntil it received Plaintiff's motion for summary judgment on May 24, 1991 ... Case did not know Plaintiff intended to contest its 47–9307(A) [UCC section 9–307(1) ] defense." [5] In addition, Case's request for more time was not supported by affidavit as Rule 56(f) requires. Therefore, the trial court did not abuse its discretion in not allowing Case additional time to conduct discovery. *See Boatman v. Samaritan Health Services, Inc.,* 168 Ariz. 207, 812 P.2d 1025 (App.1990); *Wells Fargo Credit Corp. v. Smith,* 166 Ariz. 489, 803 P.2d 900 (App.1990).

As filed, Case's response to Deutsche's motion for summary judgment demonstrated only that Case could prove the Steenslands were the sole shareholders, directors, and officers of both RSS and All Quip. That showing was plainly insufficient to justify treating the two corporations and the Steenslands as a single entity that was Case's "seller" under UCC section 9–307(1).

### 4. Authorities from other jurisdictions

In our view, the decisions from other jurisdictions cited by Case do not support its position. To the contrary, *Ex parte General Motors Acceptance Corporation (First Dallas County Bank v. General Motors Acceptance Corporation),* 425 So.2d 464 (Ala.1983), is fully consistent with our holding here. There, one Julius Davis, who operated the Davis Motor Company in Selma, Alabama, bought a 1980 Pontiac for his personal use from Marion Motor Sales in Marion, Alabama. The purchase was financed through GMAC, which became first lienholder. Davis thereafter placed the car in his own used car sales lot and sold it to Everett Smith. Davis defaulted on what he owed to GMAC and GMAC sued Smith for conversion. The court held that Smith prevailed under UCC § 9–307(1). We agree with this result because, in contrast to this case, the seller created the security interest.

Similarly, we do not see *General Motors Acceptance Corporation v. Keil,* 176 N.W.2d 837 (Iowa 1970) as a useful comparison to this case. In that case Pemberton and Keil, Inc., was an automobile dealer and Walter Keil was its president. Keil personally executed a conditional sales contract covering a 1967 Bonneville and caused a lien in favor of GMAC to be noted on the certificate of title. Pemberton and Keil, Inc., thereafter sold the Bonneville to Taylor. The court held that Taylor prevailed under section 9–307(1) stating:

> The application for the notation of the lien to appellant was made by the president of the corporate titleholder. The automobile

---

5. We find this statement disingenuous. First, there is nothing in the record to indicate that Case had previously raised such a defense. Case, in its answer, did not cite or refer to UCC section 9–307. The closest Case came was to deny that portion of Deutsche's complaint claiming Case was not a buyer in the ordinary course of business. This is not the same as Case's eventual argument that All Quip, as an alter ego of RSS and the Steenslands, was the seller that created the security interest for purposes of section 9–307. But even if we view Case's invocation of the "buyer in ordinary course" defense as raising the 9–307 argument, Case cannot claim ignorance of Deutsche's intent to challenge that argument in light of the language of Deutsche's complaint.

was purchased from the showroom of the corporate titleholder. We see no reason why the purchaser of an automobile should not be afforded the same protection as the purchaser of other property out of inventory, and we refuse to hold that the Legislature, which obviously intended broad protection to the consumer by enactment of section 554.9307(1), would anticipate the giving of preference to a lien because its creator was not as shown on the records, but another party under a confidential transaction of which the ultimate purchaser had no knowledge.

176 N.W.2d at 841. Without precisely articulating its rationale, the *Keil* court held either that Walter Keil had liened the automobile as the corporate dealer's agent, or that the dealer's corporate identity was properly disregarded. Here, the record contains no evidence on which we may do likewise.

*Adams* is similarly inapposite. In *Adams* a used car dealer temporarily assigned the title to one of the cars in inventory to one of his salesmen. The salesman used it as collateral for a personal loan and then transferred it back to the dealer before it was sold to a buyer in ordinary course. The trial court ruled for the salesman's lender, but the Supreme Court of Oklahoma reversed. The court stated:

> It is illogical to believe when the codal redactors drafted this limitation they anticipated a buyer would not be protected from misrepresentation by a used car dealer or salesman who had manipulated an automobile title for his own benefit....
>
> ... Whether dealer or Clanton, his salesman, created the security interest should not be the controlling factor.
>
> ....
>
> For the purpose of this decision under section 9–307, we find the same entity created the security interest and sold the

Ford. Accordingly, we hold Bank's security interest in the Ford terminated upon its sale to Adams as a buyer in the ordinary course of business.

565 P.2d at 30–31. *Accord C & J Leasing II Ltd. Partnership v. Swanson,* 439 N.W.2d 210 (Iowa 1989). In this way *Adams* effectively interprets section 9–307(1) as applicable by deeming unimportant one of its express requirements. The reasoning of *Adams* has been criticized as "faulty." *Ocean County National Bank v. Palmer,* 188 N.J.Super. 509, 457 A.2d 1225, 1229 (App. Div.1983). We agree.

As our discussion above should make clear, we do not disagree that the protection of section 9–307(1) may potentially extend to a buyer from a seller who acquired the collateral from a related entity that is liable as debtor under a security agreement. We cannot agree, however, that this result may be wrung out of section 9–307(1) alone, without reference to properly applicable supplementary principles of non-UCC statutory or decisional law. In this litigation, Case failed to sufficiently pursue such principles. While we admit some discomfort at the harshness of the result in this case, the language of section 9–307(1) clearly dictates that a buyer is only protected from security interests "created by his seller." Thus, the trial court did not err in granting summary judgment for Deutsche.[6]

## C. Entitlement of Deutsche to Fees Award

The trial court denied Deutsche an award of attorneys' fees pursuant to A.R.S. section 12–341.01(A). Deutsche did not cross-appeal from the judgment. It now requests an award of attorneys' fees on appeal under that section[7] or alternatively Rule 25.[8]

We stated in *Johnson v. Brimlow*:

---

6. We do not wish our holding here to be read as giving parties a license to engage in practices similar to those employed by RSS and All Quip. In our opinion, such title transfers between closely held corporations with common ownership will, upon scrutiny, often reveal a pattern of abuse of the corporate form sufficient to justify piercing the corporate veil. Unfortunately for Case, we do not know whether any such abuse occurred in this case since Case failed to discover and present evidence on that point.

7. A.R.S. section 12–341.01(A) provides: "In any contested action arising out of a contract, express or implied, the court may award the successful party reasonable attorney's fees. This section shall in no manner be construed as altering, prohibiting or restricting present or future contracts or statutes that may provide for attorney's fees."

8. Rule 25 provides in part: "Where the appeal is frivolous or taken solely for the purpose of delay

Frivolous appeals are not new or novel theories raised upon colorable claims, *Price v. Price,* 134 Ariz. 112, 114, 654 P.2d 46, 48 (App.1982), nor positions on appeal that simply fail to prevail. *Hoffman v. Greenberg,* 159 Ariz. 377, 380, 767 P.2d 725, 728 (App.1988). Instead, a frivolous appeal is one brought for an improper purpose or based on issues which are unsupported by any reasonable legal theory. *Arizona Tax Research Assoc. v. Department of Revenue,* 163 Ariz. 255, 787 P.2d 1051, 1054 (1989).

164 Ariz. 218, 222, 791 P.2d 1101, 1105 (App. 1990).

█ We find no indication in the record or the briefs that Case has prosecuted this appeal for an improper motive. We also cannot agree that Case's contentions were unsupported by any reasonable legal theory. Sanctions under Rule 25 are inappropriate.

█ In the trial court, Case opposed Deutsche's application for an award of attorneys' fees in part on the theory that A.R.S. section 12–341.01(A) did not apply because the action sounded in tort rather than contract, and in part on the proposition that the court should exercise its discretion to deny fees because Case was an innocent purchaser who was already being required to pay a judgment in excess of $12,000.00. The trial court denied Deutsche's application for fees without stating its reason, and later denied Deutsche's motion for reconsideration of that ruling.

Absent a cross-appeal, we lack jurisdiction to review the trial court's rulings. In ruling independently on Deutsche's request for an award of fees on appeal, however, we must address the same issues the parties laid before the trial court.

Case is wrong in arguing that the instant litigation does not "arise out of a contract, express or implied" within A.R.S. section 12–341.01(A). In *Barmat v. John and Jane Doe Partners A–D,* 155 Ariz. 519, 747 P.2d 1218

... the appellate court may impose upon the offending attorneys or parties such reasonable penalties or damages (including ... imposing of

(1987), our supreme court noted it previously had held that attorneys' fees may be awarded under section 12–341.01(A) if the act in question constituted both a tort and a breach of contract, " 'as long as the cause of action in tort could not exist *but for* the breach of contract.' " *Id.* at 522, 747 P.2d at 1221 (quoting *Sparks v. Republic National Life Insurance Co.,* 132 Ariz. 529, 543, 647 P.2d 1127, 1141, *cert. denied,* 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982)). The *Barmat* court stated:

> In *Sparks* we allowed fees to an insured in an action based upon the insurer's breach of an implied covenant of good faith. In such actions, neither the duty of "good faith" nor any other duty would exist between insurer and insured but for the promises between the parties. Similarly, the tort action for breach of the implied covenant of good faith could not have existed "but for" the breach of agreements, express or implied, in the contract of indemnity. Thus, whether the action for breach was pleaded in contract, in tort, or both, whether it involved the breach of an express or implied covenant, the action in *Sparks* and similar cases (*see e.g. Ford v. Revlon, Inc.,* 153 Ariz. 38, 45, 734 P.2d 580, 587 (1987)) "arises out of a contract."

*Id.*

█ Deutsche's claim in this case, though clearly one for damages for conversion, likewise depends for its existence on an alleged breach of contract—RSS's and All Quip's breach of the security agreement with Deutsche's assignor, Takeuchi Manufacturing. Deutsche's conversion action could not have existed "but for" that breach. Division Two of this court has so held twice on analogous facts. *Arizona Farmers Production Credit Association v. Northside Hay Mill & Trading Co.,* 153 Ariz. 333, 736 P.2d 816 (App.1987) (prevailing secured party awarded fees under section 12–341.01(A) in priority dispute between competing security interests

attorneys' fees) as the circumstances of the case and the discouragement of like conduct in the future may require."

**164**

in cattle herd); *Arizona Ammonia of Tucson, Inc. v. Mission Bank,* 152 Ariz. 361, 732 P.2d 591 (App.1986) (bank with perfected security interest in debtor's accounts receivable eligible for fees under section 12–341.-01(A) after successfully quashing writs of garnishment issued to collect on third party's judgment against debtor). The *Arizona Ammonia* court's statement is pertinent here:

> The Arizona Supreme Court has directed courts in Arizona to interpret broadly the types of transactions included within the "arising out of" clause of A.R.S. § 12–341.01(A). *Marcus v. Fox,* 150 Ariz. 333, 723 P.2d 682 (1986). The claims of all parties in this case arise out of the rights, obligations, validity, enforceability and priority of rights arising out of contract. *United Bank of Arizona v. Sun Valley Door & Supply, Inc.,* 149 Ariz. 64, 716 P.2d 433 (App.1986); *First National Bank of Arizona v. Continental Bank,* 138 Ariz. 194, 673 P.2d 938 (App.1983).

152 Ariz. at 364, 732 P.2d at 594.

 Our authority to award fees under section 12–341.01(A) is discretionary. *See Associated Indem. Corp. v. Warner,* 143 Ariz. 567, 694 P.2d 1181 (1985). We decline to award fees to Deutsche in this case. Case was a victim here to the same extent as Deutsche. *Cf. Valley Bank of Nevada v. JER Management Corp.,* 149 Ariz. 415, 719 P.2d 301 (App.1986) (affirming trial court's denial of fees to prevailing side as between "innocent" victims of bank depositor's scam).

Affirmed.

GRANT, P.J., and EHRLICH, J., concur.